Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/01/2019 09:07 AM CST

State of Nebraska, appellee, v.
Zachary A. Mueller, appellant.

___ N.W.2d ___

Filed December 7, 2018.    No. S-17-387.

1. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

2. **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.

4. ____: ____. Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court.

5. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

6. ____: ____: ____. To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the

tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction.

7. **Criminal Law: Venue: Proof: Waiver.** Proof of venue is essential in a criminal prosecution, and in the absence of a defendant's waiver by requesting a change of venue, the State has the burden to prove proper venue beyond a reasonable doubt.

8. **Criminal Law: Statutes: Time.** Statutes governing substantive matters in effect at the time of a crime govern, and not later enacted statutes. In contrast, procedural statutes in effect on the date of a hearing or proceeding govern, and not those in effect when the violation took place.

9. ____: ____: ____. A statute defining the elements of a crime is substantive, and the statute in effect at the time of the offense governs.

10. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

11. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

12. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

13. ____. Because of the mandatory "shall" language used in Neb. Rev. Stat. § 83-1,106 (Reissue 2014), the statute mandates that credit for time served must be given for time spent in custody on a charge when a prison sentence is imposed for a conviction of such charge.

14. ____. Neb. Rev. Stat. § 83-1,106(4) (Reissue 2014) requires that credit for time served shall be given which has not otherwise been applied, and the import of this subsection is that all credit available due to presentence incarceration shall be applied, but only once.

15. ____. What matters in the credit for time served analysis is not whether the defendant was detained in Nebraska and awaiting trial and sentencing on Nebraska charges, but, rather, whether the defendant was forced to be in custody because of those charges.

Appeal from the District Court for Morrill County: Leo P. Dobrovolny, Judge. Affirmed as modified.

Sarah P. Newell, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, and Papik, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Zachary A. Mueller appeals his convictions and sentences in the district court for Morrill County for first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. With respect to his convictions, Mueller assigns various errors related to instructions that the court gave or refused to give and also contends that there was not sufficient evidence to support his conviction for first degree murder. With respect to his sentences, Mueller claims that the court imposed excessive sentences and failed to give him adequate credit for time served. We affirm Mueller's convictions and his sentences, but we modify the sentencing order to reflect additional credit for time served.

## STATEMENT OF FACTS

Mueller was charged with first degree murder and use of a deadly weapon to commit a felony in connection with the shooting death of Pedro Adrian Dominguez. Mueller was also charged with possession of a deadly weapon by a prohibited person based on his previous felony conviction.

The investigation that resulted in the charges against Mueller began on December 4, 2015, when the body of an unidentified male was discovered inside a barrel in rural Morrill County, Nebraska. The barrel containing the body was found in a creek underneath a bridge on County Road 104, east of Bayard, Nebraska, and northwest of Bridgeport, Nebraska. On December 8, the body was identified as being that of Dominguez based on fingerprints that had been taken from the

body during an autopsy. The autopsy revealed that Dominguez had died as the result of a single gunshot to the left side of the head. The entrance wound was located on the back left side of the head, and a bullet was recovered from the right temporal bone, just above the right ear inside the skull. The trajectory of the bullet was determined to be left to right, back to front, and downward. The doctor performing the autopsy could not determine whether the gunshot wound was immediately fatal or whether Dominguez had lived for a period of time after being shot. Toxicology reports indicated that Dominguez' blood contained controlled substances, including methamphetamine and the active ingredient of marijuana.

On December 5, 2015, after the body had been discovered but before it had been identified, law enforcement officials issued a press release stating that an unidentified body had been found in a barrel on County Road 104. On December 7, officers responded to a report that a burned vehicle had been found near County Road 104 north of Bridgeport. The vehicle was a Volkswagen that had been completely burned. The passenger seat was missing from the vehicle. Because of the burned condition of the vehicle, officers were unable to find a vehicle identification number.

The investigation regarding the body in the barrel began to focus on Mueller after an acquaintance of Mueller's reported to law enforcement on December 5, 2015, that in November, he had been visiting Mueller when Mueller asked him to help get the "locking ring" sealed on the top of a barrel. The witness stated that he had asked Mueller what was inside the barrel and that Mueller replied that he did not want to know. On December 7, investigators began talking with various witnesses connected with Mueller. Investigators obtained a search warrant for Mueller's residence, which was located near Bridgeport. On December 8, they executed the search warrant. Items seized in the search of Mueller's residence included a car seat and two Colorado license plates that appeared to have been burned. Investigators retrieved other burned items, including, inter alia,

clothing, a cell phone, and a pair of glasses. Testimony at trial indicated that Dominguez wore glasses but that no glasses had been found with the body in the barrel.

Dallas Schnell, one of the witnesses interviewed in the investigation, testified at trial that on or around December 4, 2015, she had loaned her vehicle to Mueller and that in exchange, Mueller had left her a blue Volkswagen. Schnell used the Volkswagen while Mueller had her vehicle, and she noticed that the front passenger seat of the Volkswagen was missing. After hearing reports of the body found in the barrel, Schnell had conversations with Mueller, and afterward, she decided that in order to get her vehicle back from Mueller, she needed to get rid of the Volkswagen. On the evening of December 5, Schnell and a friend obtained gasoline and drove the Volkswagen to a country road outside of Bridgeport where they set the Volkswagen on fire. Schnell got her vehicle back a "[c]ouple weeks later" when the vehicle was impounded in Cheyenne, Wyoming, after Mueller had been arrested there.

The investigation led officers to believe that Felicia Talley had knowledge regarding Dominguez' death. Talley had previously been in a relationship with Mueller, and the two had a daughter together who was born in 2008. The daughter had been adopted and was being raised by Mueller's mother, Michelle Litke. Talley's testimony at trial was generally as follows.

In November 2015, Talley was living in Greeley, Colorado, and she was in a relationship with Dominguez. Talley informed Mueller that she was coming to Bridgeport the weekend before Thanksgiving, and the two planned that they would visit their daughter. Dominguez accompanied Talley on the trip, and they drove his blue Volkswagen. Talley and Dominguez went to Mueller's house, and there the three of them smoked methamphetamine that Talley and Dominguez had brought with them. Talley and Mueller later went to visit their daughter while Dominguez stayed at Mueller's house. At that time, the daughter was at the home of Schnell, who lived near Litke. After that visit, Talley and Mueller returned to Mueller's home.

Later, Talley went to visit her daughter at Litke's home. Mueller did not accompany her on this visit. Dominguez went with her but stayed outside in his car. During the visit, Talley and Dominguez went to a sandwich shop to get lunch for her daughter and for Litke. When Talley returned to Litke's home, Litke told her that Mueller was "freaking out" and "trying to kill himself." Litke thought that Talley might be able to calm him down, so Talley and Dominguez returned to Mueller's house. Talley spoke with Mueller, and she did not think that he appeared to be "really going crazy." Talley told Mueller that she and Dominguez were going to go away for a couple days and that if Mueller wanted to go with them, he could. Mueller eventually decided to go with them.

The three left Mueller's house in the blue Volkswagen, with Talley driving, Dominguez in the passenger seat, and Mueller in the back seat. They drove through Bridgeport and headed in the direction of Kimball, Nebraska. Their ultimate destination was Evanston, Wyoming, where Talley's best friend lived. Talley testified that she had been driving "probably about 15 minutes" and that she was having a conversation with Dominguez when:

> [A]ll of a sudden, "Boom!" And, I was like, what the hell? And, I looked over and there was [Dominguez] with a bullet in his head. And, he had blood coming out of the back of his head. And, [Mueller] is like, points the gun at me and says, give me a reason why I shouldn't kill you, too, Bitch. And, I was like, I don't know, maybe because we had a kid together, I don't know. That's what happened and then we got to Kimball.

Talley testified that during this time, Mueller kept calling her "Dallas."

When Talley and Mueller reached Kimball, they stopped and bought gas at a station. They then kept driving to Cheyenne, Wyoming. Talley testified that Dominguez remained in the passenger seat the entire time that she was driving. She did not see any signs that he was alive after he had been shot. When

they reached Cheyenne, Talley was "driving aimlessly around" because she "didn't know what to do." Mueller became angry that she was driving aimlessly, and he told her to let him drive, so she did. Mueller drove around Cheyenne for some time, but Talley told him he needed to stop because he had difficulty driving a manual transmission and she thought he might get pulled over. Mueller told Talley that he wanted her to kill him, and he handed his gun to Talley, who was then in the back seat. Talley took out the clip and put the gun in her pocket and told Mueller he needed to pull over. When he pulled over and opened the back seat for her, Talley got out of the vehicle and ran to a truckstop. She spent some time inside the truckstop before she saw Mueller drive away. She then asked a truckdriver for a ride so she could get away from her "crazy ex." When the truckdriver got close to Evanston, he dropped her off at a truckstop where she contacted her friend to pick her up.

Talley spent a few days in Evanston with her friend before returning to Greeley. Talley testified that she had the gun Mueller had given her for some time but that she eventually sold it for money and drugs. Talley was arrested and put in jail in Greeley on charges unrelated to this case. She was still incarcerated when law enforcement officers from Nebraska contacted her regarding the investigation into Dominguez' death. Talley initially did not cooperate with investigators. She testified that she did not report Mueller's shooting Dominguez to police because she was "raised not to be a snitch." She stated that when she was 12 years old, she had witnessed her mother commit a murder and that her mother was convicted based in part on her testimony. She testified that her mother's family blamed her for her mother's conviction and that they disowned her and "always started problems with [her]."

On cross-examination, Mueller's counsel questioned Talley regarding communications she had with acquaintances when she returned to Greeley after Dominguez had died. The general sense of the communications was that Talley told the

acquaintances that she and Dominguez were moving away but that she was back in Greeley and had methamphetamine she could sell.

During the defense presented by Mueller, the court received into evidence an agreement between Talley and the State to the effect that any statements made by Talley in connection with the investigation of Mueller or at Mueller's trial would not be used against her in any criminal prosecution except for a prosecution for perjury or giving a false statement. The agreement was described as an agreement for use immunity, and it additionally provided that Talley would not be charged with disposing of the firearm used to kill Dominguez.

As further evidence in his defense, Mueller presented the testimony of Alexandria Montoya, who was imprisoned with Talley in the Morrill County jail while Talley was being held as a witness in this case. Montoya testified that she observed Talley giving herself a tattoo on her face using a staple that she had found. Montoya asked Talley what she was doing, and Talley said that she was giving herself a tattoo of a teardrop. Montoya testified that she understood the significance of a teardrop tattoo to mean that the person with the tattoo had killed someone. Montoya testified that Talley told her that she "had killed somebody . . . she had finished off that guy, Pedro." Talley told Montoya that she "covered his face, his nose, and his mouth with her hand and so he stopped breathing." Talley told Montoya she did it because she did not want to "let anything suffer and that if they were suffering, she should take them out." Talley further told Montoya that the person to whom she had done this "was her boyfriend at the time" and that "they were having problems, something about that he owed money and she didn't — he didn't want to give her money and something in regards to her daughter." Montoya testified that Talley told her that before she put her hand over the person's mouth, someone else had shot him. She also testified that Talley told her that when this had happened, "they were out in the country, something like a farmhouse." On

cross-examination by the State, Montoya testified that Talley told her that it was Mueller who had shot her boyfriend in the back of the head.

At the jury instruction conference in Mueller's trial, Mueller requested an instruction regarding intoxication; the district court refused the instruction "based upon the evidence." Mueller objected to the court's proposed instruction defining premeditation for the reason that it included language that was not part of the statutory definition; the court overruled Mueller's objection.

The court proposed an instruction regarding venue that was based in part on Neb. Rev. Stat. § 29-1301.02 (Reissue 2016), regarding crimes committed on moving means of transportation. Mueller initially stated that he had "no objection in regards to the definition of venue," but he then suggested that Neb. Rev. Stat. § 29-1306 (Reissue 2016), regarding a "mortal blow" given in one county and the person stricken dying in another county or state, was the more appropriate venue statute under the facts of this case. He also noted that the court's proposed instruction left out language from § 29-1301.02 referring to "an offense is committed in this state," and argued that in this case, the offense was arguably not committed in this state. The court rejected Mueller's argument and determined that it would give its proposed instruction, stating that the instruction was a correct statement of law and "to give any more is not necessary and . . . may be confusing."

Mueller did not object to other instructions, including an instruction setting forth the elements of the offense of possession of a deadly weapon by a prohibited person. The case was submitted to the jury, and the jury found Mueller guilty of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person.

At the sentencing hearing, Mueller raised an issue regarding the amount of time he had served that should be credited against his sentence. Mueller presented evidence that an arrest warrant against him with regard to this case was

issued December 7, 2015, and that at that time he was being held in a jail in Wyoming based on local charges. Nebraska law enforcement officers placed a hold on Mueller, and on March 7, 2016, they were advised that Mueller was ready to be returned to Nebraska. At trial, the State argued that Mueller should be given credit for the 371 days he had served in prison in Nebraska after being returned from Wyoming. Mueller asked that he also be given credit for the additional 91 days that he had spent in jail in Wyoming after the arrest warrant was issued on December 7, 2015. As discussed below in our analysis, when Mueller was returned to Nebraska, there was no Wyoming sentence against which to credit the 91 days.

The district court sentenced Mueller to consecutive sentences of life imprisonment for first degree murder and of 20 to 40 years' imprisonment for each of the other two convictions. The court ordered that time served of 371 days be credited against his sentence for possession of a deadly weapon by a prohibited person. The court stated that it determined the correct credit to be the 371 days Mueller had spent in prison in Nebraska because "he was picked up and returned to Nebraska on the first possible day that he could be here while there was [sic] not charges pending and unresolved apparently in the State of Wyoming."

Mueller appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Mueller claims that the district court erred when it (1) gave an erroneous instruction regarding venue and refused to give a more appropriate instruction, (2) overruled his objection to the instruction defining premeditation, (3) refused his proposed instruction regarding intoxication, and (4) gave an instruction regarding the elements of possession of a deadly weapon by a prohibited person that did not reflect a statutory amendment defining the offense enacted after the trial. Mueller also claims that there was insufficient evidence to support his conviction for first degree murder. He further claims that the

district court imposed excessive sentences and that it erred when it failed to give him credit for the 91 days that he spent in custody in Wyoming.

## STANDARDS OF REVIEW

[1] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

[2] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. McCurdy, ante* p. 343, 918 N.W.2d 292 (2018).

[3] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court. *State v. Leahy, ante* p. 228, 917 N.W.2d 895 (2018).

[4] Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court. *Id*.

## ANALYSIS

*Standards Relating to Appellate*
*Review of Jury Instructions.*

In his first four assignments of error, Mueller claims that the court erred when it gave an erroneous jury instruction or refused to give a requested instruction. The following standards relate to our review of assignments of error regarding jury instructions given or refused.

[5] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the

questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant. *State v. Swindle, supra*. All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal. *Id*.

[6] To establish reversible error from a court's refusal to give a requested instruction, an appellant has the burden to show that (1) the tendered instruction is a correct statement of the law, (2) the tendered instruction is warranted by the evidence, and (3) the appellant was prejudiced by the court's refusal to give the tendered instruction. *Id*.

*Venue Instruction.*

Mueller first claims that the district court erred when it gave an instruction regarding venue that was not appropriate based on the facts of the case and refused to give a more appropriate instruction. We conclude that although the instruction given by the district court did not fully state the applicable law, given the evidence in this case, the instruction was not prejudicial.

[7] Under Neb. Rev. Stat. § 29-1301 (Reissue 2016), unless certain exceptions apply, all criminal cases are to be tried in the county where the offense was committed. We have stated that proof of venue is essential in a criminal prosecution and that, in the absence of a defendant's waiver by requesting a change of venue, the State has the burden to prove proper venue beyond a reasonable doubt. *State v. Dodson*, 250 Neb. 584, 550 N.W.2d 347 (1996), *overruled on other grounds, State v. Paul*, 256 Neb. 669, 592 N.W.2d 148 (1999). Statutes related to § 29-1301, including §§ 29-1301.02 and 29-1306, provide for how venue is determined in certain specific circumstances.

At trial, Mueller argued that the venue instruction proposed by the court was not appropriate under the circumstances of this case and he suggested that a different venue instruction

should be given. The instruction proposed by the court was generally based on § 29-1301.02, which provides:

When an offense is committed in this state, on board a vessel navigating a river, bay, slough, lake, or canal, or lying therein, in the prosecution of its voyage, or on a railroad train, or car, motor vehicle, common carrier transporting passengers, or on an aircraft prosecuting its trip, the accused may be tried in any county through, on, or over which the vessel, train, car, motor vehicle, common carrier, or aircraft passes in the course of its voyage or trip, or in the county in which the voyage or trip terminates.

The court's proposed instruction regarding venue read as follows:

Venue for the crimes charged is Morrill County, Nebraska *if* the acts constituting the crime(s) occurred in Morrill County, Nebraska or, if the offense(s) was/were committed in a vehicle or motor vehicle and the vehicle or motor vehicle passed through, on, or over Morrill County, or the trip terminated in Morrill County, Nebraska.

(Emphasis supplied.)

Mueller argued that instead of the proposed venue instruction based on § 29-1301.02, the court should give an instruction based on § 29-1306, which provides:

If any person shall give any mortal blow or administer any poison to another, in any county within this state, with intent to kill, and the party so stricken or poisoned thereof shall die in any other county or state, the person giving such mortal blow or administering such poison may be tried and convicted of murder or manslaughter, as the case may be, in the county where such mortal blow was given or poison administered.

Mueller argued that § 29-1306 was better suited to the circumstances of this case than § 29-1301.02, because § 29-1306 is specific to homicide cases. Mueller also noted that the portion of the court's venue instruction related to an offense committed

during a motor vehicle trip omitted the opening phrase of § 29-1301.02, which requires that the offense was committed in this state.

We note that although Mueller argued that the court should have given a venue instruction based on § 29-1306, he did not actually tender such an instruction, and that therefore, to the extent Mueller asserts on appeal that the court erred when it refused a requested instruction, under the applicable standards set forth above, we cannot review whether the "tendered instruction" was a correct statement of the law or whether it was warranted by the evidence. See *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018). However, we can review whether the venue instruction the court actually gave was proper under the circumstances; a consideration of whether the instruction should have included the content of § 29-1306 is an incidental part of that analysis.

In this appeal, Mueller has the burden to show that the venue instruction given by the court was prejudicial or otherwise adversely affected his substantial right, and in making this determination, we read all the jury instructions together and consider whether, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence. See *State v. Swindle, supra*. Based on these standards, we conclude that the venue instruction given by the court did not constitute prejudicial error requiring reversal.

The instruction generally stated venue in Morrill County was proper if either (1) the acts constituting the offense occurred in Morrill County or (2) the offense occurred during a motor vehicle trip that passed through or terminated in Morrill County. The part of the instruction regarding an offense occurring during a motor vehicle trip was an accurate, if not a complete, recitation of the statute. Although the instruction identified venue as "Morrill County, Nebraska," as Mueller notes, the instruction did not fully recite the statute, because it left off the part of § 29-1301.02 that said the offense had to

have been "committed in this state." But we do not think that this omission constituted prejudicial error in this case.

Talley's testimony was the main direct evidence regarding whether Mueller shot Dominguez and the location where the shooting occurred. Talley testified that the shooting in the motor vehicle occurred about 15 minutes after she, Mueller, and Dominguez left Bridgeport and were headed toward Kimball. The State had earlier presented testimony by the chief deputy of the Morrill County sheriff's office, regarding Highway 88, which ran south from Bridgeport in the direction of Kimball. The deputy testified that approximately 25 miles of Highway 88 along that route were in Morrill County before the route crossed into an adjacent county which was still in Nebraska. Based on this testimony, the inference regarding where the shooting occurred would be that it occurred in Morrill County or possibly in the adjacent Nebraska county.

Although Talley's testimony may have been uncertain as to the specific county in which the shooting occurred, her testimony was clear that the shooting happened en route between Bridgeport and Kimball. Therefore, although there may have been different reasonable inferences regarding the specific county in which the shooting occurred, the only reasonable inference from Talley's testimony to the effect that the shooting occurred after they left Bridgeport but before they reached Kimball was that the shooting occurred in Nebraska. There was no other evidence from which one could reasonably find that Mueller shot Dominguez in Wyoming or anywhere outside Nebraska. Because a state location issue was not presented by the evidence, the trial court's omission of the portion of § 29-1306 to the effect that the offense occurred in Nebraska did not constitute prejudicial error requiring reversal.

Mueller's argument that an instruction based on § 29-1306 would have been more appropriate is also not availing. Under § 29-1306, venue is established in the county in which the person is shot, and § 29-1306 addresses a situation in which a person is shot in one county but dies in a different county or a

different state. In the present case, in order to establish venue in Morrill County under § 29-1306, it would need to be shown that Dominguez was shot in Morrill County. The instruction given by the court did instruct that venue was in Morrill county *if*, inter alia, "the acts constituting the crime(s) occurred in Morrill County." We do not read § 29-1306 as adding a new requirement that venue is established in the county in which the victim is shot; instead, we read it as clarifying that the act constituting the crime is the shooting and that venue remains in the county where the shooting occurred whether the victim died in that county or in another county or state. By including the word "if" before the remaining substance of its instruction, the court effectively gave the jury the opportunity to decide if the State had carried its burden of establishing venue in Morrill County. Adding the content of § 29-1306 was unnecessary and would have confused the jury. Mueller was not prejudiced by the omission of the substance of § 29-1306.

We conclude that the court's venue instruction, based in part on § 29-1301.02, reflected the correct law, was not misleading, and adequately covered the issues supported by the pleadings and the evidence in this case. We conclude that the venue instruction given by the court did not constitute prejudicial error requiring reversal.

*Premeditation Instruction.*

Mueller next claims that the district court erred when it gave an instruction that he asserts incorrectly defined premeditation. We conclude that the instruction was consistent with our prior case law and was not erroneous.

The court's instruction regarding premeditation stated, "**Premeditation** means to form a design to do something before it is done. The time needed for premeditation may be so short as to be instantaneous provided that the intent to act is formed before the act and not simultaneously with it." When this instruction was proposed, Mueller did not oppose the first sentence, which was based on the definition of premeditation in Neb. Rev. Stat. § 28-302(3) (Reissue 2016). Instead, he

specifically objected to the second sentence on the basis that it was not part of the statutory definition of "premeditation."

The second sentence of the instruction given in this case is based on NJI2d Crim. 4.0. In *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015), and *State v. Taylor*, 282 Neb. 297, 803 N.W.2d 746 (2011), we rejected a challenge comparable to that which Mueller raises in this case. Mueller acknowledges this precedent but asks us to overrule it. He argues the language of the second sentence comes from case law that preceded the statutory definition adopted by the Legislature in § 28-302(3) and that by approving the instruction, this court violates "the separation of powers clause and basic principles of statutory interpretation." Brief for appellant at 22.

We addressed these arguments in *Custer*, wherein we reasoned that "a court's proper role is to interpret statutes and clarify their meaning" and that the premeditation instruction given in that case "interprets and clarifies the statutory definition; it does not change or contradict the statutory definition." 292 Neb. at 105, 871 N.W.2d at 257. Our reasoning in *Custer* applies to the instant case, and we continue to believe it is a prudent approach to statutory interpretation. We see no reason to overrule our precedent, and we therefore conclude that the district court did not err when it gave the premeditation instruction in this case.

*Intoxication Instruction.*

Mueller also claims that the district court erred when it refused his proposed instruction regarding intoxication. We reject this assignment of error.

Mueller requested the following instruction regarding intoxication:

There has been evidence that [Mueller] was intoxicated or under the influence of drugs at the time of the murder with which he is charged was committed.

Intoxication is a defense only when a person's mental abilities were so far overcome by the use of alcohol and/ or drugs that he could not have had the required intent of

deliberation and/ or premeditation. You may consider evidence of alcohol and/ or drug use with all other evidence in deciding whether [Mueller] had the required intent.

The district court refused the instruction "based upon the evidence."

Mueller acknowledges the existence of Neb. Rev. Stat. § 29-122 (Reissue 2016), which provides:

A person who is intoxicated is criminally responsible for his or her conduct. Intoxication is not a defense to any criminal offense and shall not be taken into consideration in determining the existence of a mental state that is an element of the criminal offense unless the defendant proves, by clear and convincing evidence, that he or she did not (1) know that it was an intoxicating substance when he or she ingested, inhaled, injected, or absorbed the substance causing the intoxication or (2) ingest, inhale, inject, or absorb the intoxicating substance voluntarily.

In the present case, there was no evidence that Mueller did not know that what he had ingested was an intoxicating substance or that Mueller's ingestion of an intoxicating substance was not voluntary. However, Mueller argues that the application of § 29-122 in this case violated his constitutional rights, because it relieved the State of its burden to prove the requisite mental state beyond a reasonable doubt. We do not agree.

We note first that Mueller did not raise a constitutional challenge to § 29-122 below. But in any event, we further note that we rejected the same challenge that Mueller argues in this appeal in *State v. Abejide*, 293 Neb. 687, 879 N.W.2d 684 (2016). In *Abejide*, we determined that "[b]y removing voluntary intoxication from consideration of whether the defendant had the required mental state, § 29-122 redefines the circumstances under which the requisite mental state may be found but it does not relieve the State of its burden to prove the requisite mental state." 293 Neb. at 700, 879 N.W.2d at 695. In reaching this determination, we relied on *Montana v. Egelhoff*, 518 U.S. 37, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996).

Mueller acknowledges *Abejide*, but asserts that we misread *Egelhoff* and urges us to overrule *Abejide*. We decline to do so. Mueller contends that § 29-122 limits the admissibility of otherwise relevant evidence and that such limitation would not be acceptable under *Egelhoff*. Contrary to Mueller's assertion, upon reexamination, we believe that we correctly reasoned in *Abejide* that "similar to the statute at issue in *Egelhoff, supra*, § 29-122 is a 'legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions.'" 293 Neb. at 700, 879 N.W.2d at 695. As such, it does not limit the admissibility of otherwise relevant evidence. And, in fact, in this case, evidence was admitted regarding Mueller's being under the influence of methamphetamine at the time of the shooting.

Mueller's proposed instruction did not correctly state the law under § 29-122, and there was no evidence that would warrant an instruction regarding involuntary intoxication under § 29-122. Here, as in *Abejide*, because the defendant presented no evidence that his intoxication was involuntary, we need not consider whether § 29-122 may constitutionally require "clear and convincing evidence" that intoxication was involuntary or whether § 29-122 may constitutionality require the defendant to bear the burden of persuasion on the issue of involuntary intoxication.

In this case, the only issue involving intoxication is whether the district court erred when it refused to give Mueller's requested instruction. As discussed above, Mueller's requested instruction on intoxication did not correctly state the law under § 29-122. For this and other reasons, Mueller has not shown that the district court's refusal to give his proposed instruction was reversible error.

*Possession of a Deadly Weapon by a*
*Prohibited Person Instruction.*

Although he did not object to the instruction at trial, Mueller claims on appeal that the district court erred when it gave an instruction setting forth the elements of possession of a deadly

weapon by a prohibited person. We find Mueller's challenge to be without merit.

Mueller recognizes that the instruction given by the district court was consistent with the statutory definition of possession of a deadly weapon by a prohibited person set forth in Neb. Rev. Stat. § 28-1206 (Reissue 2016), which was in effect in 2015, the time the offense charged in this case was committed. However, he notes that the Legislature made amendments to § 28-1206 that went into effect on May 10, 2017, after Mueller's trial and sentencing in this case. Mueller argues that the amendments changed the elements of the crime with which he was charged and that he should have been given the benefit of those amendments.

[8] We have stated that statutes governing substantive matters in effect at the time of a crime govern, and not later enacted statutes. *State v. Galindo*, 278 Neb. 599, 774 N.W.2d 190 (2009). We have further stated that, in contrast, procedural statutes in effect on the date of a hearing or proceeding govern, and not those in effect when the violation took place. *Id*. We have elucidated the distinction between substantive and procedural statutes as follows:

> A change in law will be deemed to affect matters of substance where it increases the punishment or changes the ingredients of the offense or the ultimate facts necessary to establish guilt. In other words, a rule is substantive if it alters the range of conduct or the class of persons that the law punishes. In contrast, rules that regulate only the *manner of determining* a defendant's culpability are procedural.

*State v. Galindo*, 278 Neb. at 614-15, 774 N.W.2d at 210 (emphasis in original).

[9] Based on this reasoning, a statute defining the elements of a crime is substantive and the statute in effect at the time of the offense governs. Therefore, in the present case, the version of § 28-1206 that was in effect on the date of the charged offense governs and amendments to the statute pertaining to

possession of a deadly weapon by a prohibited person that were enacted after Mueller's trial do not apply. We conclude that the district court did not err when it instructed the jury using the elements set forth in the statute that was in effect at the time the charged offense was committed.

*Sufficiency of Evidence to Support*
*Conviction for First Degree Murder.*

Mueller claims that there was not sufficient evidence to support his conviction for first degree murder. He specifically argues that there was significant evidence that pointed to Talley, rather than Mueller, as being the murderer and that even if the jury could find that Mueller killed Dominguez, there was not sufficient evidence to prove that he had done so purposely and with deliberate and premeditated malice. We conclude that there was sufficient evidence to support the conviction.

With regard to his argument that there was significant evidence that Talley killed Dominguez, Mueller refers to evidence of allegedly inculpatory statements Talley made in text messages and social media communications to friends as well as the statements she made to Montoya in the Morrill County jail. Mueller generally argues that such evidence indicates that Talley and Dominguez had relationship problems when they were in Bridgeport and that after Dominguez was killed, Talley was concerned that she would be in trouble in connection with his death. Mueller also emphasizes Montoya's testimony to the effect that Talley said she had killed her boyfriend by putting her hand over his mouth to stop his breathing and end his suffering after he had been shot.

The jury was able to consider the evidence that Mueller contends implicated Talley as being Dominguez' killer and could reasonably have determined that such competing evidence did not diminish its view that the State had proved Mueller guilty beyond a reasonable doubt. The evidence highlighted by Mueller could show that Talley was concerned she would be in trouble as an accomplice to the murder, which does not negate Mueller's involvement in the death of Dominguez. To the extent

Montoya testified that Talley said she had killed Dominguez by stopping his breathing, Montoya further testified that Talley had said that she had done so after Mueller shot Dominguez and that her actions were intended to stop Dominguez' suffering. The autopsy evidence indicated that Dominguez died as a result of the gunshot wound, and therefore, the jury could find that Mueller caused Dominguez' death even if it believed that Talley's actions may have hastened his death.

Mueller further contends that even if the jury found that he had shot Dominguez, it could not have found that he did so purposely and with deliberate and premeditated malice. He argues that a finding of premeditation is not consistent with Talley's testimony that Mueller shot Dominguez "very suddenly and seemingly out-of-the-blue." Brief for appellant at 41. Mueller also argues that there was evidence that he was showing signs of paranoia as a result of being under the influence of methamphetamine and that such condition prevented him from forming the requisite intent.

We have reviewed the record and determine that the jury could have found the requisite intent despite the evidence to which Mueller directs our attention. Talley's testimony that the shooting was "sudden" could reasonably be understood as happening suddenly from her perspective, because she was not aware of what Mueller may have been thinking or deliberating prior to shooting Dominguez. Talley did not testify regarding any sudden quarrel or other event that could have caused Mueller to shoot without deliberation or premeditation. Instead, she testified that immediately prior to the shooting, she was having a conversation with Dominguez while Mueller was in the back seat. Talley further testified that after shooting Dominguez, Mueller pointed the gun at her and asked her to give a reason he should not shoot her also. Based on Talley's description, the jury could reasonably have found that Mueller was acting purposely and deliberately and had premeditated the murder, even if only for a short time before taking such action.

The jury could also reasonably have found that Mueller had the requisite intent despite evidence that he was under the influence of methamphetamine and showing what lay people described as signs of paranoia. As discussed above in connection with Mueller's requested instruction on intoxication, under § 29-122, voluntary intoxication is not to be taken into consideration in determining the existence of a mental state that is an element of the criminal offense. Furthermore, there was evidence of Mueller's actions and statements at the time of the shooting and thereafter that indicated that he was not acting entirely without reason and that he could have formed the requisite intent to kill.

We conclude that there was sufficient evidence to support Mueller's conviction for first degree murder.

*Excessive Sentences.*

Mueller claims that the district court imposed excessive sentences. Mueller acknowledges that his conviction for first degree murder required a mandatory life sentence and that his sentence for use of a deadly weapon to commit a felony was statutorily required to be served consecutively to his life sentence. He therefore focuses his arguments on the length of his sentence for use and the consecutive sentence for possession of a deadly weapon by a prohibited person. We conclude that the district court did not abuse its discretion when it sentenced Mueller.

Use of a deadly weapon to commit a felony is a Class IC felony under Neb. Rev. Stat. § 28-1205(1)(c) (Reissue 2016), and possession of a deadly weapon by a prohibited person is a Class ID felony under § 28-1206(3)(b). Under Neb. Rev. Stat. § 28-105 (Reissue 2016), a Class IC felony is subject to a sentence of imprisonment for a mandatory minimum of 5 years and a maximum of 50 years, and a Class ID felony is subject to a sentence of imprisonment for a mandatory minimum of 3 years and a maximum of 50 years. Therefore, Mueller's sentences were within statutory limits and we review his sentencing for an abuse of discretion by the district court.

[10-12] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Leahy, ante* p. 228, 917 N.W.2d 895 (2018). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id*. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

Mueller generally argues that because he was already subject to a mandatory life sentence for first degree murder and a mandatorily consecutive sentence for the use conviction, it was excessive to add another consecutive and lengthy sentence of imprisonment for the possession of a deadly weapon conviction. He argues that the court did not give adequate weight to his individual circumstances, particularly his history of substance abuse which resulted from the influence of an uncle who was heavily involved in drugs and the lack of a relationship with his father. He also argues that his substance abuse mitigates the present offenses, as well as the previous offenses in his criminal history, because substance abuse caused him to act impulsively.

At the sentencing, the court stated that it had reviewed Mueller's presentence report and had considered all the required factors for sentencing. The record does not indicate that the court considered any improper factors. The State notes that Mueller's criminal record indicates a history of violence and that testing showed him to be at a very high risk to reoffend.

Mueller's argument that his substance abuse caused him to act impulsively carries less weight considering that, as discussed above, the evidence in this case supported the finding that his actions were deliberate and premeditated. Furthermore, the sentences at issue relate to his use and possession convictions and the evidence does not indicate that he acted impulsively in using or possessing the firearm in this case. We further note that Mueller's minimum sentence of 20 years for each conviction is in the middle of the statutory range and that it was within the court's discretion to order the sentence for possession to be served consecutively. See *State v. Leahy, supra*.

We conclude that the district court did not abuse its discretion in imposing consecutive sentences of imprisonment for 20 to 40 years for the use and possession convictions.

*Credit for Time Served in Wyoming.*

Finally, Mueller claims that the district court erred when it failed to give him credit against his sentences for time he served in Wyoming. The State concedes, and we agree, that Mueller should have been given credit for an additional 91 days.

The evidence presented at the sentencing hearing was that an arrest warrant had been issued against Mueller with regard to this case on December 7, 2015. At that time, he was being held in a jail in Wyoming based on charges that arose in Wyoming. Nebraska law enforcement officers placed a hold on Mueller, and on March 7, 2016, they were advised that Mueller was available to be returned to Nebraska.

In the district court, Mueller asked that he be given credit for the additional 91 days that he had spent in jail in Wyoming after the arrest warrant was issued on December 7, 2015, in addition to the 371 days he had served in prison in Nebraska after being returned from Wyoming. The court ordered that time served of 371 days be credited against Mueller's sentence for possession of a deadly weapon by a prohibited person. But the court did not give credit for the 91 days in the Wyoming jail, stating that Mueller had been "picked up and returned to

Nebraska on the first possible day that he could be here while there was [sic] not charges pending and unresolved apparently in the State of Wyoming."

Neb. Rev. Stat. § 83-1,106 (Reissue 2014) provides in relevant part:

(1) Credit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based. This shall specifically include, but shall not be limited to, time spent in custody prior to trial, during trial, pending sentence, pending the resolution of an appeal, and prior to delivery of the offender to the custody of the Department of Correctional Services, the county board of corrections, or, in counties which do not have a county board of corrections, the county sheriff.

. . . .

(4) If the offender is arrested on one charge and prosecuted on another charge growing out of conduct which occurred prior to his or her arrest, credit against the maximum term and any minimum term of any sentence resulting from such prosecution shall be given for all time spent in custody under the former charge which has not been credited against another sentence.

[13-15] We have stated that because of the mandatory "shall" language used in § 83-1,106, the statute mandates that credit for time served must be given for time spent in custody on a charge when a prison sentence is imposed for a conviction of such charge. *State v. Banes*, 268 Neb. 805, 688 N.W.2d 594 (2004). We further stated in *Banes* that § 83-1,106(4) was to be read "as requiring that such credit shall be given which has not otherwise been applied, and the import of this subsection is that all credit available due to presentence incarceration shall be applied, but only once." 268 Neb. at 811, 688 N.W.2d at 599. We also recently stated that "what

matters in the credit for time served analysis is not whether [the defendant] was detained in Nebraska and awaiting trial and sentencing on Nebraska charges, but, rather, whether [the defendant] was forced to be in custody *because of those charges.*" *State v. Leahy, ante* p. 228, 235, 917 N.W.2d 895, 900-01 (2018) (emphasis in original). Given the existence of the arrest warrant and the hold placed on Mueller, we determine that he was forced to be in custody because of those charges. See *id.*

Mueller states in his brief on appeal that the Wyoming charges were dismissed without his time spent in custody being credited against any sentence in Wyoming. The State does not dispute this and notes that although the record on appeal does not explicitly reflect that the Wyoming charges were dismissed, the presentence report contains a court order from Wyoming stating that Mueller was being released on his own recognizance in order to "return to Nebraska to resolve pending charges there."

Contrary to its position at trial, the State now asserts that because the 91 days Mueller spent in custody in Wyoming had not been credited against any sentence imposed in Wyoming at the time Mueller was sentenced on the present convictions in Nebraska, the district court should have applied credit for the 91 days against one of his sentences in this case. We agree with the State's concession.

After Nebraska law enforcement officers placed a hold on Mueller on December 7, 2015, he was held in custody in Wyoming for 91 days. Section 83-1,106(4) required that he be given credit for that time, but only once. If Mueller had been given credit for that time against a sentence imposed in Wyoming, it would not be available for credit against his Nebraska sentences. But the Wyoming order noted by the State indicated that at the time he was returned to Nebraska, he had not been sentenced in Wyoming, and that therefore, there was no Wyoming sentence against which the time served could be credited.

In view of the above, the district court should have credited the 91 days Mueller spent in jail in Wyoming against one of Mueller's Nebraska sentences. Because the court credited the 371 days Mueller spent in prison in Nebraska against his sentence for possession of a deadly weapon by a prohibited person, it is clear that the district court intended that credit be given against that charge. We therefore conclude that the sentencing order should be modified to state that Mueller's sentence for possession of a deadly weapon by a prohibited person should be credited for time served in the amount of 462 days rather than the 371 days ordered by the district court.

## CONCLUSION

Having rejected Mueller's assignments of error related to jury instructions and sufficiency of the evidence, we affirm his convictions for first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. We reject Mueller's claim that his sentences were excessive, but we agree that the district court erred when it did not give him credit for 91 days of time served in Wyoming. We therefore affirm Mueller's sentences, but the sentencing order shall be modified to state that he be given credit for time served in the amount of 462 days against his sentence for possession of a deadly weapon by a prohibited person.

AFFIRMED AS MODIFIED.

FREUDENBERG, J., not participating.