Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
01/03/2020 09:05 AM CST

State of Nebraska, appellee,
v. Talon J. Lee, appellant.
___ N.W.2d ___

Filed October 11, 2019.    No. S-18-702.

1. **Rules of Evidence: Other Acts: Appeal and Error.** An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Neb. Evid. R. 404(2), Neb. Rev. Stat. § 27-404(2) (Reissue 2016), or under the inextricably intertwined exception to the rule.
2. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
3. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.
4. **Effectiveness of Counsel: Appeal and Error.** In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
5. **Jury Instructions: Appeal and Error.** Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.
6. **Sentences: Appeal and Error.** An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.
7. **Rules of Evidence: Other Acts.** Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, is so blended or connected to the charged crime that proof of the charged

crime will necessarily require proof of the other crimes or bad acts, or is necessary for the prosecution to present a coherent picture of the charged crime.

8. ____: ____. The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of other conduct that forms an integral part of the crime charged is not rendered inadmissible under Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016), merely because the acts are criminal in their own right, but have not been charged.

9. **Jury Instructions: Proof: Appeal and Error.** In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.

10. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

11. ____: ____. Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.

12. **Sentences: Appeal and Error.** When a trial court's sentence is within the statutory guidelines, the sentence will be disturbed by an appellate court only when an abuse of discretion is shown.

13. **Judgments: Words and Phrases.** Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

14. **Sentences.** The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

15. **Effectiveness of Counsel: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.

16. **Effectiveness of Counsel: Proof.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

17. \_\_\_\_: \_\_\_\_. To show deficient performance in a claim of ineffective assistance of counsel, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.

18. \_\_\_\_: \_\_\_\_. To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

19. **Effectiveness of Counsel: Records.** Trial counsel cannot be ineffective for failing to do that which the record affirmatively establishes was done.

20. **Hearsay.** Statements are not hearsay if they are offered to show the effect on the listener.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

Stephen P. Kraft for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Freudenberg, J.

## I. NATURE OF CASE

Defendant was charged with two counts of sexual assault of a child in the first degree, one count of attempted sexual assault of a child in the first degree, one count of sexual assault of a child in the third degree, and one count of incest with a victim age 17 or under. After trial, a jury found defendant guilty and convicted him on all charges. The district court sentenced him to an aggregate period of 100 years' to life imprisonment, plus an additional imprisonment term of 32 to 73 years. Defendant appeals his convictions and sentences. On appeal, defendant assigns a number of evidentiary errors, including errors involving Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016) (Rule 403); Neb. Evid. R. 404, Neb. Rev. Stat. § 27-404 (Reissue 2016) (Rule 404); and Neb. Evid.

R. 412, Neb. Rev. Stat. § 27-412 (Reissue 2016) (Rule 412). Defendant also alleges that the district court inappropriately instructed the jury regarding venue in this case. We affirm the decision of the district court.

## II. FACTS

### 1. Charges

On September 19, 2017, the State of Nebraska charged Talon J. Lee with two counts of sexual assault of a child in the first degree, a Class IB felony; one count of attempted sexual assault of a child in the first degree, a Class II felony; one count of sexual assault of a child in the third degree, a Class IIIA felony; and one count of incest with a victim age 17 or under, a Class IIA felony. The charges arose from reports of Lee's sexual abuse against R.W., Lee's 10-year-old daughter, and another girl, M.B., who was 9 to 10 years old at the time of the alleged abuse. Lee pled not guilty to the State's charges, and the case proceeded to trial.

### 2. Motion in Limine

Prior to trial, the State made a motion in limine seeking to admit at trial evidence of a sexual assault of R.W. that occurred in Iowa shortly after the incidents of sexual assault of R.W. and M.B. being charged in this case. Specifically, the State wished to introduce at trial witness testimony as to R.W.'s statements that Lee sexually penetrated her, made her "play with his private part," and showed her pornographic videos at Lee's Iowa home approximately 3 months after the incidents occurring in Nebraska. The State's motion alleged that this evidence was relevant and admissible because it was inextricably intertwined with Lee's current charges and, thus, not subject to Rule 404. Alternatively, the State alleged the testimony was admissible under Rule 404(2) and Neb. Evid. R. 414, Neb. Rev. Stat. § 27-414 (Reissue 2016) (Rule 414). The State withdrew its argument regarding Rule 414, however, prior to the hearing. The defense claimed that the Iowa incident should be excluded because, unlike other incidents

found to be admissible under our case law as inextricably intertwined, the Iowa assault was not one continuous chain of events. Further, defense counsel pointed out that according to R.W.'s allegations, the incident in Iowa was the last incident to occur. So, according to the defense, the Iowa incident formed no part of the factual setting of the Nebraska charges and was not inextricably intertwined.

The district court granted the State's motion, ultimately entering two orders on the matter. In its first order, entered March 19, 2018, the court found that the Iowa incident was relevant and material to the State's charges. As such, the district court concluded that the evidence related to the Iowa incident was inextricably intertwined to the State's charges. In the alternative, the district court concluded that the evidence of the Iowa incident was admissible under Rule 414.

Subsequently, the district court entered a second order nunc pro tunc to its previous order, where it removed its analysis and conclusion relating to Rule 414, but reaffirmed its finding that the evidence was inextricably intertwined. In doing so, the district court stated:

> [T]he evidence of sexual abuse in Council Bluffs[,] Iowa is inextricably intertwined with the other allegations of sexual abuse [Lee] perpetrated on his daughter over the period of time alleged by the State and is so blended or connected to the charged crimes that it will be necessary to show a complete and coherent picture of this relationship.

### 3. LEE'S RULE 412 MOTION

Lee filed a pretrial motion to obtain permission to adduce testimony about R.W.'s having been sexually abused in the past by her biological brother. According to Lee's motion, this evidence was relevant to show that someone other than the accused was the "source of injury" to R.W. Lee's motion alleged that such evidence was admissible under Rule 412 and that the exclusion of such evidence would "violate [his] constitutional rights."

At the hearing on Lee's Rule 412 motion, Lee asserted that during the investigation in this case, R.W. disclosed that she was sexually abused by her brother at some point around 2016, when she was approximately 10 years old. R.W. reportedly indicated that her brother tried to penetrate her with his penis in the same way that Lee did. Lee acknowledged that R.W.'s brother had not been adjudicated of the allegations, but noted that there was a juvenile proceeding pending against him pertaining to these allegations.

Lee argued that this alleged prior sexual assault of R.W. was relevant to show how R.W. had a "prior source of sexual knowledge." In other words, Lee explained, the jury would likely be wondering how R.W., as a 10-year-old child, could possess the type of sexual knowledge she has if she was not sexually abused by Lee. The fact she has been sexually abused by her brother in the past would show why she has such knowledge and that it came from a source other than Lee.

The State disagreed and argued that this evidence was inadmissible and improper because it would lead to a credibility debate regarding R.W.'s allegations in the separate and unrelated matter, which would create "a trial within a trial." Based on this, the State argued that any probative value of the incident would be outweighed by the danger of unfair prejudice.

The district court denied Lee's motion and ruled that the evidence at issue was inadmissible. The district court entered a written order on the matter, which concluded:

> There is no evidence the acts of [R.W.'s brother] have any relevance to the sexual assault committed by [Lee] or that the sexual behavior of R.W. incident to being assaulted by [her brother] in any way contributed to any physical injury of R.W. The court does not find the same to be relevant nor material to the charges against [Lee] nor would exclusion of this evidence violate the constitutional rights of [Lee].

### 4. Trial

At trial, the State elicited testimony from both victims; the victims' mothers; several members of law enforcement from both Omaha, Nebraska, and Iowa; and a physician who examined R.W. The State also called witnesses employed by Project Harmony, a child advocacy center that serves children when there have been allegations of abuse, who were involved in the investigation. The Project Harmony employees included a pediatric nurse who examined and interviewed R.W. and M.B. and a forensic interviewer who examined and interviewed R.W. and M.B. The defense offered testimony from Lee's wife, Nikisha Lee.

### (a) Incidents

Testimony from R.W., M.B., and the victims' mothers established the following facts.

From the fall of 2016 to the spring of 2017, Lee was living with Nikisha in Council Bluffs, Iowa. R.W. lived with Lee and Nikisha in November and December 2016. Aside from those 2 months, R.W. lived in Omaha with her mother.

The victims' mothers testified that they knew each other because they both have children with Lee. Lee fathered at least one of M.B.'s siblings. R.W. would often spend time with M.B. and her siblings. Lee would occasionally watch R.W. and M.B. when he was in Omaha, which is when the alleged incidents occurred. Lee was 29 years old at the time of the alleged incidents.

After R.W. moved back to Omaha to live with her mother, R.W. and her mother stayed for a few weeks with one of R.W.'s mother's friends, Jasmine Kelly. One night at approximately 5 p.m., while they were staying with Kelly, Lee arrived unannounced and took R.W. to a store. When Lee and R.W. were leaving for the store, R.W.'s mother also left to run an errand. R.W.'s mother testified that this errand took about 30 to 45 minutes. When she returned to Kelly's house, Lee and R.W. were still gone. R.W.'s mother testified that she called Lee to find out where they were, because it was a school night and

R.W. needed to get home. Lee responded that they were "down the street" and would be home soon. As more time passed and Lee and R.W. still were not home, R.W.'s mother continued to call Lee. R.W.'s mother testified that she called Lee roughly 50 times that night and that Lee answered only a couple of those calls. Lee eventually brought R.W. home around midnight.

R.W. testified that after she and Lee left Kelly's house that night, Lee drove her to a "dark place" where there was a building with gates and a "bunch of trees." Lee parked the car and asked R.W., "Can you do me a favor?" R.W. agreed, and Lee proceeded to suck on her finger and say "'no teeth.'" Lee then asked her to suck his "private part" and told her he would take her to the store afterward. Lee put his "private part" in her mouth, and she sucked on it until "[s]ome stuff" went into her mouth, which she said tasted "[n]asty." R.W. testified that her mother called Lee's cell phone several times but Lee told her not to answer it, so she did not. Lee also told her not to tell anyone about what happened. He took her to the store and eventually back to Kelly's house. R.W. testified that she did not tell anyone what happened when she got back to Kelly's home, because she was scared.

R.W. testified that another incident of abuse occurred when she was having a sleepover with M.B. at M.B.'s house. R.W. and M.B. woke up when they heard a deep voice downstairs. The girls went downstairs and learned that the voice was Lee's. R.W. and M.B. then sat on the couch and started playing "Truth or Dare." Eventually, Lee sat between them and told the girls that they were going to play "Dirty Truth or Dare."

R.W. testified that Lee made M.B. do the first dare and told her to suck his "private part" and said, "[Y]ou got to wake him up," referring to his penis as "him." Lee told M.B. to "play with it" to "wake it up," and she complied. Lee told her to suck it, and it "got bigger in her mouth." Then, according to R.W., while M.B. was sucking on Lee's penis, Lee told R.W. to pick a dare, which she did, and he "made me play with it while she was sucking it." Lee then had R.W. and M.B. take

turns sucking it. R.W. testified that as this was going on, Lee also played a video on his cell phone of "[a] girl sucking a boy private part."

M.B., through her testimony, confirmed that she and R.W. played a game of "Dirty Truth or Dare" with Lee in her basement the morning after R.W. spent the night. She testified that when she or R.W. would pick a dare, he would ask them to suck his "private part" or to lick each other's "boobs," but that they said no. Then, he asked R.W. "to let him finger her," but R.W. again said no. M.B. said she and R.W. went upstairs for a while. When they came back downstairs, Lee was on his cell phone "watching porn," which she described as girls with no clothes touching each other and doing "nasty things." Then, according to M.B., Lee pulled R.W. over next to him and told R.W. to "lick his private part," which R.W. did. M.B. stated that Lee then made M.B. move her hand up and down on his penis. M.B. testified that Lee also asked her to suck his penis but that she said no.

R.W. and M.B. testified that on another day at M.B.'s house, they played "Hide and Seek" with Lee. When Lee found where R.W. and M.B. were hiding, he told them to kiss each other. Lee wanted them to kiss on the lips or to put their tongues in each other's mouths, but they kissed on the cheek instead. R.W. testified that Lee also made them strip down to their underwear and a tank top and that he touched both of them on the buttocks.

According to R.W. and M.B, on one of the same days that they played "Truth or Dare" or "Hide and Seek," Lee called R.W. and M.B. into M.B.'s mother's bedroom, where Lee was lying on the floor next to the bed. Lee asked the girls to "sit on his private part," which neither of them did. According to M.B., Lee then pulled R.W. toward him and had her sit on his stomach. R.W. testified that she thought Lee had his clothes on during this incident, but M.B. testified that he did not have any clothes on and recalled seeing his "private part" when this occurred.

R.W. testified about another incident, involving only R.W. and Lee, which occurred at Lee and Nikisha's house in Council Bluffs. R.W. testified that one day, when Nikisha was not home, Lee was lying on the bed in his bedroom and he called her into the room to ask for a "favor." They watched another pornographic video, and Lee asked R.W. to play with his penis. R.W. complied. R.W. testified that Lee told her to take off her pants, which she did. Lee then stood up behind her and put his penis inside her buttocks and vagina. R.W. testified that it hurt, so she told Lee she needed to go to the bathroom, where she noticed that she was bleeding from her anus. When she told Lee about it, he told her to get into the bathtub. R.W. testified that this incident in Council Bluffs was the last time Lee did anything to her, although on cross-examination, she gave differing responses on the timeline of the sexual assaults. Lee objected to the evidence about the Council Bluffs incident on Rule 404 grounds. Lee received a continuing objection on these grounds to the testimony relating to the incident in Council Bluffs.

R.W. testified that she did not initially tell anyone about any of these incidents, because Lee had told her and M.B. that he would "make up a bad lie" about them if they ever did so. Later that summer, however, in June 2017, R.W. decided to tell M.B.'s aunt about what Lee had been doing to her while she was at M.B.'s mother's house with M.B. M.B.'s aunt relayed this disclosure to M.B.'s mother, who, in turn, told R.W.'s mother.

R.W.'s mother testified that she got a call from M.B.'s mother on the night of June 22, 2017, while she was at work. R.W.'s mother immediately called R.W. and spoke with her about what she'd heard from M.B.'s mother. R.W.'s mother testified that when R.W. told her about the incident in Lee's car, it all "ma[de] sense," because she remembered "calling, calling, calling" Lee's cell phone on the night he took R.W. to the store. R.W.'s mother called M.B.'s mother again after that,

because, based on what R.W. told her, it appeared the abuse also involved M.B.

R.W.'s mother testified that she left work that night to take R.W. to an emergency room. She said that after the abuse was revealed, R.W. started acting out at school and getting into fights, and that she eventually got "kicked out of school."

On June 23, 2017, after speaking further with M.B., M.B.'s mother filed a police report regarding the sexual assault of M.B. M.B.'s mother testified that when she spoke with M.B. about what she had heard, M.B. started to cry and eventually told her things that had happened, which disclosure led to her decision to file a police report. M.B.'s mother confirmed that her house was in Omaha and said that she could recall three times that Lee came over to her house and watched the children in February and March 2017.

### (b) Dr. Cynthia Hernandez

R.W. was seen at an emergency room in the early morning hours of June 23, 2017. The doctor who examined R.W., Dr. Cynthia Hernandez, testified that she spoke with R.W. about why she was there. R.W. told her that on one occasion, Lee put his penis in her mouth until "white stuff" came out, and that on another occasion, he put his penis in her vagina and anus, which caused her to bleed. Hernandez testified that R.W. told her that one of the incidents occurred about 1 month earlier and the other about 2 months earlier. When Hernandez examined R.W., she did not find any signs of physical injury and referred R.W. to Project Harmony for a more detailed examination. Hernandez explained that this was not surprising given how much time had passed since the incidents. Hernandez also testified that, in general, it is not uncommon in cases of sexual assault for there to be no physical signs of trauma. However, on cross-examination, Hernandez agreed that signs of internal injury, especially with anal penetration, could possibly be detected months after an assault had occurred.

### (c) Law Enforcement

The State elicited testimony from several law enforcement officers who were involved in the joint investigation that was being conducted by the Omaha Police Department (OPD) and the Council Bluffs Police Department (CBPD).

Amber Kennedy, the lead detective for CBPD, testified that the date range for CBPD's investigation was January 1 to May 13, 2017. Kennedy described that Project Harmony had originally referred the case to CBPD. She had watched the video-recorded forensic interview and determined it contained evidence to show that a crime had been committed in Omaha and also in Council Bluffs. After reviewing all of the evidence, CBPD decided that OPD needed to be involved as well, because it appeared that their investigations would overlap. Kennedy testified that CBPD and OPD were aware of each other's investigations and maintained communication throughout the investigations, which ultimately led to Lee's arrest. Though it was asserted by Kennedy that charges have been filed in Iowa, there was no evidence presented of the charges and it was conceded that a trial had not occurred regarding the alleged incidents in Council Bluffs.

From OPD, the State examined Mark McKenna and Lisa Crouch. McKenna testified that he was the officer who took M.B.'s mother's report of the sexual abuse of M.B. McKenna confirmed that M.B.'s mother identified Lee in her report. Upon the filing of the report, McKenna forwarded the investigation to the child victim sexual assault unit.

Crouch testified that she was a detective in the special victims unit, specifically the child victim sexual assault unit. Crouch testified that the date range of their investigation was January to March 2017. She stated that her involvement in this case began when an information report was generated through OPD indicating possible sexual abuse. Crouch stated that upon receiving that assignment, she received other information while observing a video-recorded forensic interview of R.W. by a forensic examiner at Project Harmony.

### (d) Project Harmony

#### (i) Amy Cirian

The State called Amy Cirian, a forensic interviewer at Project Harmony who interviewed R.W. and M.B regarding the reported assaults. Cirian testified as to R.W.'s and M.B.'s demeanors throughout the forensic interview. Cirian described R.W.'s demeanor as calm but a little nervous and "fidgety," while M.B. was calm throughout most of her interview. Cirian opined that there is no singular demeanor that she would expect a child to have when discussing sexual abuse, because many children react differently. She noted further that it is not her role to determine the credibility or reliability of the girls' statements or disclosures, but, rather, to simply gather information throughout the interview process as to the abuse allegations.

At the outset of this demeanor testimony, defense counsel objected on the basis of relevance, which was overruled by the district court. On cross-examination, defense counsel elicited testimony from Cirian that just as there is no particular behavior she can look to in order to determine whether a child has been sexually abused, there is no way of determining from behavior whether a child has not been abused.

Cirian also testified as to certain procedures and protocols that are followed throughout these interviews. Cirian's testimony specifically detailed what actions were taken or what protocols were triggered in response to the girls' disclosures. Cirian testified that per these protocols, she is required to meet with the multidisciplinary team only when there is a sexual assault disclosure made at the forensic interview. Cirian stated that she met with the multidisciplinary team after interviewing the girls.

#### (ii) Sarah Cleaver

R.W. and M.B. were examined by a pediatric nurse practitioner at Project Harmony. Both of their physical examinations came back normal with no signs of injury or sexually

transmitted diseases. The nurse practitioner, Sarah Cleaver, who has conducted over 1,000 sexual assault examinations, testified that it is normal to find no signs of physical injury in child sexual assaults, because children often do not disclose right away and their bodies heal very quickly. Cleaver testified that an estimated 95 percent of children who report sexual abuse have normal physical examinations.

Cleaver testified that during R.W.'s examination, R.W. indicated that Lee's penis had been in her mouth more than once and that his ejaculate had been in her mouth. Cleaver also stated R.W. claimed that Lee had penetrated her anus with his penis one time and that he took the condom off and continued to penetrate her anus, but that there was no ejaculate. R.W. reported that bleeding followed after she was penetrated anally. Cleaver testified that R.W. reported that Lee penetrated R.W. vaginally while wearing a condom. Finally, Cleaver testified that M.B. indicated during her examination that Lee had touched her buttocks over her clothes and had made her touch his penis with her hand.

### (e) Nikisha

After the State rested, Lee called Nikisha to testify. Nikisha confirmed that R.W. would occasionally stay with her and Lee between January and March 2017. She testified that when R.W. stayed with them in Council Bluffs, they always interacted as a family and Lee was never alone with R.W. at their home. The only interactions Nikisha observed between Lee and R.W. were normal father-daughter activities. Nikisha acknowledged, however, that Lee would occasionally go to Omaha without her to care for his other children and that he may have had contact with R.W. and M.B. at those times.

### 5. Jury Instruction Conference

At the close of all the evidence, the parties held a jury instruction conference outside the presence of the jury. During the conference, the parties focused on the venue element of count I, sexual assault of a child in the first degree, and

count V, incest with a victim age 17 or younger. The disputed venue elements were addressed in jury instructions Nos. 5 and 6.

The relevant portion of jury instruction No. 5 provided:

COUNT I

. . . .

The material elements which the State must prove by evidence beyond a reasonable doubt, in order to convict the Defendant of the crime of First Degree Sexual Assault on a Child as charged in the Amended Information are:

1. That on or about January 1[,] 2017 through January 31, 2017, the Defendant, Talon Lee, did subject [R.W.] to sexual penetration;

2. That Defendant, Talon Lee, (a) did so in Douglas County, Nebraska, or (b) brought [R.W.] into or out of Douglas County, Nebraska in the commission of the offense, or (c) did an act in Douglas County, Nebraska instigating, procuring, promoting, or aiding in the commission of the offense;

3. That at that time Talon Lee was nineteen years of age or older; and

4. That at that time, [R.W.] was under twelve years of age.

. . . .

COUNT V

. . . .

The material elements which the State must prove by evidence beyond a reasonable doubt, in order to convict the Defendant of the crime of Incest of a Victim 17 or Under as charged in the Amended Information are:

1. That on or about January 1, 2017 through January 31, 2017, the Defendant Talon Lee did knowingly engage in sexual penetration with [R.W.];

2. That Defendant, Talon Lee, (a) did so in Douglas County, Nebraska, or (b) brought [R.W.] into or out of Douglas County, Nebraska in the commission of the

offense, or (c) did an act in Douglas County, Nebraska instigating, procuring, promoting, or aiding in the commission of the offense;

3. That Talon Lee and [R.W.] are parent and child; and

4. That at that time, [R.W.] was under eighteen years of age.

Also related to the venue element of counts I and V, jury instruction No. 6 provided:

According to the law in the State of Nebraska, when an offense is committed in this state, in a car or motor vehicle, the accused may be tried in any county through, on or over which the vehicle passes in the course of its trip, or in the county in which the trip terminates.

Lee objected solely to the venue element definitions for counts I and V of jury instruction No. 5, arguing that it incorrectly incorporated language from Neb. Rev. Stat. § 29-1301.01 (Reissue 2016). Lee argued that this statute was inapplicable to this case, because it applies only when an offense is alleged to have occurred in different counties within the state, which was not the case here. Lee argued that this case involved the possibility that Lee "crosse[d] a state line" in the process of committing the alleged offense, but that it did not involve an allegation that it occurred in two different counties within Nebraska. As such, Lee argued that § 29-1301.01 was inapplicable.

The State disagreed and argued that jury instruction No. 5 correctly incorporated § 29-1301.01. The State noted that there was no evidence the offense in Lee's car occurred in Iowa or some other state, but argued that instruction No. 5, as written, nonetheless appropriately addressed the notion that a portion of the offense could have occurred in Douglas County while another portion of the offense could have occurred elsewhere.

Ultimately, the district court agreed with the State and overruled Lee's objection to jury instruction No. 5. The court read jury instruction No. 5 as written.

Neither party objected to jury instruction No. 6. Jury instruction No. 6 incorporated the language of Neb. Rev. Stat. § 29-1301.02 (Reissue 2016), which relatedly addresses venue for crimes committed on moving means of transportation.

### 6. JURY VERDICT AND SENTENCING

The jury found Lee guilty as charged on all five counts. In June 2018, the sentencing hearing was held. The district court reviewed the presentence investigation report and considered Lee's age, mentality, education, experience, social and cultural background, criminal record, and law-abiding conduct, as well as the motivations for these offenses and the nature of the offenses, including the presence or absence of violence. Based on this information, the court determined that Lee was a dangerous sexual predator and sentenced him as follows: 50 years' to life imprisonment on count I, sexual assault of a child in the first degree; 50 years' to life imprisonment on count II, sexual assault of a child in the first degree; 20 to 50 years' imprisonment on count III, attempted sexual assault of a child in the first degree; 2 to 3 years' imprisonment on count IV, sexual assault of a child in the third degree; and 10 to 20 years' imprisonment on count V, incest with a victim age 17 or under. Lee's sentences were ordered to run consecutively, resulting in an aggregate period of 100 years' to life imprisonment, plus an additional term of 32 to 73 years' imprisonment. Lee was also ordered to register as a sex offender under Nebraska's Sex Offender Registration Act.

### III. ASSIGNMENTS OF ERROR

Lee assigns, restated and renumbered, that the district court erred by (1) granting the State's motion to allow evidence that Lee sexually assaulted R.W. in the State of Iowa, (2) denying Lee's Rule 412 motion, (3) giving erroneous and misleading jury instructions which relieved the State from proving essential elements of the crimes charged, (4) failing to give a limiting instruction, and (5) imposing excessive sentences.

He also assigns that he received ineffective assistance of counsel at trial, because his trial counsel did not perform at least as well as a criminal lawyer with ordinary training and skill in the area and such deficient performance prejudiced his defense. Lee specifically asserts that his trial counsel (1) made inappropriate comments to the prosecutor and Lee, (2) did not review discovery with him, (3) told Lee that he could not call witnesses he wished to call at trial, (4) failed to raise a *Batson*[1] challenge, (5) failed to litigate Lee's motion to sever charges, and (6) failed to object to improper hearsay evidence.

## IV. STANDARD OF REVIEW

[1] An appellate court reviews for abuse of discretion a trial court's evidentiary rulings on the admissibility of a defendant's other crimes or bad acts under Rule 404(2), or under the inextricably intertwined exception to the rule.[2]

[2,3] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by such rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[3] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[4]

[4] In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[5]

---

[1] *Batson v. Kentucky*, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

[2] *State v. Burries*, 297 Neb. 367, 900 N.W.2d 483 (2017).

[3] *Id.*

[4] *Id.*

[5] *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017).

[5] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[6]

[6] An appellate court will not disturb a sentence imposed within the statutory limits absent an abuse of discretion by the trial court.[7]

## V. ANALYSIS

Lee argues that the district court erred by (1) granting the State's motion to allow evidence that Lee sexually assaulted R.W. in the State of Iowa, (2) denying Lee's Rule 412 motion, (3) giving erroneous and misleading jury instructions which relieved the State from proving essential elements of the crimes charged and failing to give a limiting instruction, and (4) imposing excessive sentences. Lee also asserts that he received ineffective assistance of counsel throughout his proceedings below. We affirm the decision of the district court.

### 1. Inextricably Intertwined Incident

At the outset, Lee assigns that the district court abused its discretion by granting the State's motion in limine, allowing it to admit evidence regarding R.W.'s sexual assault allegations that occurred in Iowa, and, relatedly, overruling Lee's renewed objections at trial to the admission of that evidence. In its order on the motion in limine, the district court concluded:

> [T]he evidence of sexual abuse in Council Bluffs[,] Iowa is inextricably intertwined with the other allegations of sexual abuse [Lee] perpetrated on his daughter over the period of time alleged by the State and is so blended or connected to the charged crimes that it will be necessary to show a complete and coherent picture of this relationship.

[6] *State v. Paez*, 302 Neb. 676, 925 N.W.2d 75 (2019).

[7] *State v. Chairez*, 302 Neb. 731, 924 N.W.2d 725 (2019).

Lee, however, claims the evidence regarding the alleged incident of sexual assault in Iowa was inadmissible under Rule 404 and should have been excluded at trial. Specifically, Lee argues that the court failed to conduct a hearing pursuant to Rule 404(3) finding clear and convincing evidence of the other crime.

[7,8] We agree with the district court that Rule 404 did not apply, because the alleged Iowa incident was inextricably intertwined with the crimes charged.[8] Further, since Rule 404 did not apply, the court was not required to conduct a hearing under Rule 404(3). Inextricably intertwined evidence includes evidence that forms part of the factual setting of the crime, is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or is necessary for the prosecution to present a coherent picture of the charged crime.[9] The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of other conduct that forms an integral part of the crime charged is not rendered inadmissible under Rule 404 merely because the acts are criminal in their own right, but have not been charged.[10]

The State asserts that evidence of the Iowa incident was integral to the development of an accurate timeline in this case.[11] The State asserts that without the evidence of the Iowa incident, it would have appeared that it took R.W. much longer to disclose the sexual abuse than it actually did. Further, the absence of such evidence would have created a misleadingly incoherent picture that would have adversely impacted R.W.'s credibility.[12] We agree.

---

[8] See *State v. Burries, supra* note 2.

[9] See *id*.

[10] *State v. Robinson*, 271 Neb. 698, 715 N.W.2d 531 (2006); *State v. Kelly*, 20 Neb. App. 871, 835 N.W.2d 79 (2013).

[11] See *id*.

[12] See *id*.

Our precedent shows that we have upheld the admission of evidence under the inextricably intertwined rule when the defendant's other bad acts showed his pattern of sexually abusing a child or exposing the child to sexually explicit material.[13] For example, in *State v. Baker*,[14] we held that the inextricably intertwined exception applied where the defendant's other bad acts showed his pattern of sexually abusing the victim. In *Baker*, the State's evidence included the victim's testimony that the defendant had threatened her with harm if she reported him, the mother's testimony that the defendant threatened her and physically assaulted her if she did not bring the victim to the bedroom at his direction, and the mother's testimony that the defendant became sexually aroused while watching the victim administer a massage. The defendant claimed this evidence was inadmissible under Rule 404(2), but we concluded the State was entitled to present this evidence as part of a coherent factual setting of the crime.

We likewise conclude here that the district court did not abuse its discretion in determining the evidence of a subsequent sexual assault involving the same victim was inextricably intertwined with the charged offenses. The evidence adduced at trial established that R.W. and her mother were living in Omaha with Kelly, one of R.W.'s mother's friends, in January 2017 when Lee sexually assaulted R.W. in his car, which was the first incident of sexual assault that occurred. Throughout R.W.'s testimony, she had difficulty providing the exact dates of the subsequent sexual assaults at M.B.'s house. Nevertheless, R.W. recalled that the incident in Iowa was the last incident that had occurred. This information was significant, because Hernandez testified that when R.W. spoke with her at the emergency room on June 23, 2017, R.W. told Hernandez that the most recent incident occurred about 1 month earlier and that

---

[13] See, e.g., *State v. Baker*, 280 Neb. 752, 789 N.W.2d 702 (2010); *State v. McPherson*, 266 Neb. 734, 668 N.W.2d 504 (2003).

[14] *State v. Baker, supra* note 13. See, also, *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

another incident occurred about 2 months earlier. This information in its entirety creates a timeline demonstrating that the sexual assaults charged occurred in Omaha, lending coherence as to why R.W. would have reported to Hernandez that the last assault occurred around May 2017.

R.W.'s testimony of the Iowa incident forms the factual setting of the charged offenses and is necessary to present a complete and coherent picture of the facts of this case. Such evidence showed a pattern of Lee's sexually abusing R.W. and exposing her to sexually explicit material. Based on this, it cannot be said that the district court abused its discretion in admitting the testimony regarding the alleged Iowa incident into evidence.

## 2. Defendant's Rule 412 Motion

Next, Lee assigns that the district court abused its discretion in denying Lee's motion under Rule 412 seeking to admit testimony regarding R.W.'s sexual assault allegation against her brother. Lee argues that he was prejudiced by the district court's denial of his motion, because evidence of R.W.'s alleged sexual assault by her brother would be relevant to show a "prior source of [R.W.'s] 'sexual knowledge.'"[15] The State opposed the motion and argued that this evidence was more prejudicial than probative because it would result in a "trial within a trial." The district court agreed with the State's argument and reasoned, "How do we know her brother didn't do all of these things? . . . I don't think we're going to put [R.W] on trial on that issue."

In denying Lee's request, the district court stated:

There is no evidence the acts of [R.W.'s brother] have any relevance to the sexual assault committed by [Lee] or that the sexual behavior of R.W. incident to being assaulted by [her brother] in any way contributed to any physical injury of R.W. The court does not find the same to be relevant nor material to the charges against [Lee]

---

[15] See brief for appellant at 32.

> nor would exclusion of this evidence violate the constitutional rights of [Lee].

It is apparent from the hearing on Lee's motion and the district court's subsequent order that it excluded the evidence upon both Rule 403 and Rule 412 grounds.

Lee claims that this case is similar to *State v. Lavalleur*,[16] in which we held it was reversible error to exclude evidence of other independent sexual acts involving the victim. In *Lavalleur*, the State had charged the defendant with sexually assaulting the victim, who was a friend and coworker of the defendant. At trial, the defendant sought to introduce evidence that the victim was involved in an intimate relationship with a third party on the date in question, which, according to the defense, gave the victim a motive to falsely report the sexual assault against the defendant to preserve her relationship with the third party. The trial court excluded the evidence, finding that it was irrelevant under Rule 403 and inadmissible under Rule 412. In reversing, we explained that Rule 412 generally prohibits evidence only of sexual predisposition or "'sexual behavior,'" which we explained refers to specific instances of conduct.[17] We explained that "'[i]f questioning about [a] subject were to lead to evidence or questions about details of particular acts, encounters, or practices, then such evidence and quests are indeed covered by rape shield legislation . . . .'"[18] But, we reasoned that the mere fact that the complaining witness is in an ongoing relationship raises no such concerns about details of particular acts, encounters, or practices, because being in an ongoing relationship is not ordinarily described as "'sexual conduct,'" even if the relationship involves ongoing sexual intimacy.[19] Accordingly, we found that the evidence the defendant sought to introduce was

---

[16] *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014).

[17] *Id*. at 111, 853 N.W.2d at 212.

[18] *Id.*

[19] *Id.*

not precluded and that it was both relevant and material to the defense that the victim had a motive to lie about the nature of her sexual encounter with the defendant to "dispel any air of infidelity."[20]

Here, unlike *Lavalleur*, the defense was not seeking to attack the credibility of R.W. by showing that she was involved in another ongoing relationship which gave her a motive to lie about the allegations against Lee. Rather, Lee sought to introduce this evidence to show that there was some other conceivable basis for R.W.'s sexual knowledge. Lee asserts that the evidence of R.W.'s prior alleged sexual abuse by her brother was particularly relevant in this case because, without this evidence, "the only conclusion for the jury to make is that this allegation against [Lee] must have occurred or how else would this child know about this sort of behavior."[21]

Such evidence requires a finding of admissibility under both Rule 403 and Rule 412. Here, the district court agreed with the State's argument that the evidence would be more prejudicial than probative and thus was not admissible under Rule 403. We do not believe the district court abused its discretion in reaching that conclusion. R.W.'s brother had not been convicted or adjudicated of the allegations that he had sexually assaulted R.W. As a result, admission of the evidence would have led to a potentially distracting "trial within a trial" which would have substantially risked confusing the issues and misleading the jury. Moreover, an inquiry into whether R.W. was also abused by her brother would have done nothing to offset M.B.'s testimony that Lee had abused her.

### 3. Jury Instructions

Next, Lee asserts that the district court erred in giving jury instruction No. 5, because it was misleading and relieved the State from proving an essential element of the crimes charged.

---

[20] *Id*. at 115, 853 N.W.2d at 214.

[21] Brief for appellant at 32-33.

Specifically, Lee asserts that the district court erred by failing to properly instruct the jury regarding venue on both count I (first degree sexual assault of R.W.) and count V (incest of R.W.), both of which pertained to the first incident in Lee's car in January 2017.

Relatedly, Lee assigns that the district court erred by failing to give a limiting instruction to the jury on the importance of keeping separate during its deliberations the charges from the evidence related to those charges. However, based on the record, Lee did not object to the court's jury instructions on this basis at the trial court level. He made an objection solely as to jury instruction No. 5. An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal.[22] Because this assignment was not raised below, we address only Lee's assignment of error regarding jury instruction No. 5.

[9-11] In an appeal based on a claim of an erroneous jury instruction, the appellant has the burden to show that the questioned instruction was prejudicial or otherwise adversely affected a substantial right of the appellant.[23] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[24] Whether jury instructions are correct is a question of law, which an appellate court resolves independently of the lower court's decision.[25]

Lee maintains that jury instruction No. 5 incorrectly instructed the jury regarding venue on counts I and V, because the instruction did not limit the venue to Douglas County, or even Nebraska. He claims that jury instruction No. 5 allowed

---

[22] *Ecker v. E & A Consulting Group*, 302 Neb. 578, 924 N.W.2d 671 (2019).

[23] *State v. Mueller*, 301 Neb. 778, 920 N.W.2d 424 (2018).

[24] *Id.*

[25] *State v. Paez, supra* note 6.

the jury to find him guilty on counts I and V if they believed that these counts occurred "anywhere," which effectively relieved the State of its burden to prove venue on these counts.[26] He argues that the overbreadth of this instruction was especially prejudicial because of the evidence presented at trial regarding Lee's alleged sexual abuse of R.W. in Iowa.

Jury instructions Nos. 5 and 6, read together, set forth the elements for venue in this case. Jury instruction No. 5, specifically subsection 2, incorporated the language of § 29-1301.01 and provided that one of the material elements which must be proved was

> [t]hat Defendant, Talon Lee, (a) did so in Douglas County, Nebraska, or (b) brought [R.W.] into or out of Douglas County, Nebraska in the commission of the offense, or (c) did an act in Douglas County, Nebraska instigating, procuring, promoting, or aiding in the commission of the offense.

Jury instruction No. 6 similarly incorporates language from § 29-1301.02 and provided: "[W]hen an offense is committed in this state, in a car or motor vehicle, the accused may be tried in any county through, on or over which the vehicle passes in the course of its trip, or in the county in which the trip terminates."

Reading jury instructions Nos. 5 and 6 together, we disagree with Lee's argument. When these instructions are read in conjunction, they correctly instruct the jury that the offenses that occurred in a motor vehicle (counts I and V) must have been "committed in this state." Further, based on the record before us, there was no evidence presented that would indicate that the relevant incident occurring between Lee and R.W. in his car occurred in Iowa or a state other than Nebraska, leaving no basis for a jury to reach that conclusion. As such, we conclude that Lee was not prejudiced as to necessitate a reversal on these grounds.

---

[26] Brief for appellant at 44.

## 4. Excessive Sentences

[12] Lee next assigns that that the district court erred by imposing excessive sentences. When a trial court's sentence is within the statutory guidelines, the sentence will be disturbed by an appellate court only when an abuse of discretion is shown.[27]

On counts I and II, Lee was found guilty of first degree sexual assault of a child, which is a Class IB felony punishable by a mandatory minimum of 20 years' imprisonment and a maximum of life in prison.[28] Lee was sentenced to 50 years' to life imprisonment on each count of this offense.

On count III, Lee was found guilty of attempted first degree sexual assault of a child, which is a Class II felony punishable by 1 to 50 years' imprisonment.[29] Lee was sentenced to 20 to 50 years' imprisonment on this offense.

On count IV, Lee was found guilty of third degree sexual assault of a child, which is a Class IIIA felony punishable by up to 3 years' imprisonment and 18 months' postrelease supervision, a $10,000 fine, or both.[30] Lee was sentenced to 2 to 3 years' imprisonment on this offense.

Finally, on count V, Lee was found guilty of incest with a victim age 17 or under, which is a Class IIA felony punishable by 0 to 20 years' imprisonment.[31] Lee was sentenced to 10 to 20 years' imprisonment on this offense.

Running consecutively, Lee's sentences equate to an aggregate period of 100 years' to life imprisonment, plus an additional 32 to 73 years' imprisonment.

Lee does not contest that his sentences were within the statutory limitations. He solely argues that the district court abused

---

[27] See *State v. Huff*, 282 Neb. 78, 802 N.W.2d 77 (2011).

[28] See Neb. Rev. Stat. §§ 28-319.01 and 28-105 (Reissue 2016).

[29] See § 28-319.01, Neb. Rev. Stat. § 28-201(4)(a) (Reissue 2016), and § 28-105.

[30] See Neb. Rev. Stat. §§ 28-320.01 (Reissue 2016) and 28-105.

[31] See Neb. Rev. Stat. §§ 28-703 (Reissue 2016) and 28-105.

its discretion by imposing an unjustly lengthy total sentence as compared to other Nebraska cases where defendants were convicted of similar crimes. Consequently, Lee's sentences will be disturbed only upon a finding of abuse of discretion.

[13,14] Abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.[32] When imposing a sentence, a sentencing judge should consider the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the violence involved in the commission of the crime.[33] The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.[34]

There is no evidence in the record demonstrating that the sentencing court considered inappropriate or unreasonable factors in forming Lee's sentences. The district court reviewed the presentence investigation report, which revealed Lee had an extensive criminal history. The district court also considered Lee's age, mentality, education, experience, social and cultural background, and law-abiding conduct, as well as the motivations for these offenses, the nature of the offenses, and the presence or absence of violence, including sexual violence. Considering the totality of this information, the court determined that Lee was a dangerous sexual predator and imposed his above-described sentences.

We cannot conclude that the district court made its decision based upon reasons that were untenable or unreasonable,

[32] *State v. Collins*, 292 Neb. 602, 873 N.W.2d 657 (2016).

[33] *State v. Huff, supra* note 27.

[34] *State v. Custer*, 292 Neb. 88, 871 N.W.2d 243 (2015).

nor was the district court's action clearly against justice or conscience, reason, and evidence. Therefore, we conclude that the sentencing court did not abuse its discretion and that Lee's sentences are not excessive.

## 5. Ineffective Assistance of Counsel

Lastly, Lee asserts a number of claims of ineffective assistance of trial counsel. Specifically, he argues that (1) he overheard his trial counsel talking with the prosecutor and indicating she believed Lee was guilty, and that when he confronted her about it, she told him to "go back to his cell and taste his own semen and see what it tastes like"[35]; (2) his trial counsel did not review discovery with him; (3) his trial counsel told him that he could not call any other witnesses that he wished to call at trial; (4) his trial counsel failed to raise a *Batson*[36] challenge, which he believes was appropriate because there was "not a single African American" in the venire[37]; (5) he was prejudiced by his trial counsel's deficient performance by failing to litigate Lee's motion to sever charges; and (6) he was prejudiced by his trial counsel's deficient performance by failing to object to improper hearsay and opinion testimony from Cirian, the forensic interviewer.

[15] Lee has new counsel on direct appeal. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record.[38] Once raised, the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.[39]

---

[35] Brief for appellant at 50.

[36] *Batson v. Kentucky, supra* note 1.

[37] Brief for appellant at 51.

[38] *State v. Chairez, supra* note 7.

[39] *Id.*

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[40] When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.[41]

Lee and the State agree that the record is insufficient to address four of Lee's assertions on direct appeal that trial counsel was ineffective, made under the heading "Defendant's preservation of Post Conviction Relief issues."[42] In this regard, Lee asserts, first, that he overheard trial counsel telling the prosecutor she believed he was guilty and, when confronted about the conversation, told Lee to "go back to his cell and taste his own semen and see what it tastes like." Second, Lee contends that trial counsel refused to allow him to review the entire discovery in the case, including the Project Harmony reports and the video-recorded forensic interview, which he asserts impeded his ability to assist in his defense and would have led Lee to insist that trial counsel call "adverse witnesses, including . . . Kelly who was purportedly present during an alleged assault."[43] Third, Lee argues that trial counsel told him he could not call any other witnesses in his defense, which prevented him from adducing the testimony of "adverse witnesses," including Kelly. Fourth, Lee asserts trial counsel was

---

[40] See *State v. Abdullah*, 289 Neb. 123, 853 N.W.2d 858 (2014).

[41] See *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

[42] Brief for appellant at 50.

[43] *Id.* at 51.

ineffective by failing to raise a *Batson* challenge to a jury consisting of "not a single African American" and by failing to preserve any *Batson* challenge by not having a record made of the lack of diversity of the venire.

We find these assertions sufficient to preserve the alleged claims of deficiency, with one caveat. Appellate counsel must give on direct appeal the names or descriptions of any uncalled witnesses forming the basis of a claim of ineffective assistance of trial counsel.[44] Otherwise, a potential postconviction court would be unable to identify whether a claim based on the alleged failure to call a particular witness was preserved on direct appeal.[45] Here, appellate counsel raised only the failure to call witness Kelly with sufficient specificity. Any other claim as to "adverse witnesses" has not been preserved.

As we have held in countless cases where the record on direct appeal was insufficient for assessing ineffective assistance of counsel claims, the issue that often arises is that the trial record reviewed on appeal is "devoted to issues of guilt or innocence" and does not usually address issues of counsel's performance.[46] The same can be said in this case. The record on appeal is simply devoid of any evidence of the circumstances and facts regarding the four contentions of ineffective assistance of counsel that were adequately presented. Therefore, we decline to reach these claims on direct appeal based on the insufficiency of the record before us.

However, we find that the record is sufficient to address on direct appeal Lee's claims that his trial counsel was deficient by failing to (1) litigate Lee's motion to sever charges and (2) object to improper hearsay and opinion testimony from Cirian. Where the record is sufficient to address the ineffective assistance of counsel claim, an appellate court reviews

---

[44] See *State v. Abdullah, supra* note 40.

[45] See *id.*

[46] *Id*. at 128, 853 N.W.2d at 864.

the factual findings of the lower court for clear error.[47] But with regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*,[48] an appellate court reviews such legal determinations independently of the lower court's decision.[49]

[16-18] To prevail on a claim of ineffective assistance of counsel under *Strickland*, the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[50] To show deficient performance, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[51] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[52]

### (a) Motion to Sever

[19] Lee contends that the charges involving R.W. should have been severed from the charges involving M.B., so his trial counsel should have pursued their motion to sever and was ineffective in failing to do so. However, based on the record before us, trial counsel did in fact "litigate" and "pursue" Lee's motion to sever. Lee's trial counsel filed a four-page motion detailing the requested severances. At the beginning of a pretrial hearing on March 15, 2018, trial counsel stated that she wished to withdraw the motion, but then she argued the motion toward the end of these pretrial hearings. Trial counsel

---

[47] *State v. Chairez, supra* note 7.

[48] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[49] *State v. Filholm, supra* note 41.

[50] *Id.*

[51] *State v. Chairez, supra* note 7.

[52] *Id.*

maintained that a severance was warranted and laid out the requested severances. The district court subsequently denied severance via a written order. Thus, this motion to sever was in fact argued and ruled upon. Trial counsel cannot be ineffective for failing to do that which the record affirmatively establishes was done.

### (b) Failure to Object to
### Cirian's Testimony

[20] Regarding counsel's failure to object to Cirian's testimony on hearsay grounds, Lee argues that his trial counsel should have objected to Cirian's testimony about what actions were required to be taken or what protocols were triggered in response to R.W.'s and M.B.'s disclosures, because this was inadmissible "derivative hearsay."[53] Lee cites no authority to support this "derivative hearsay" argument, nor are we aware of any precedent or authority that indicates such evidence constitutes inadmissible "derivative hearsay." To the contrary, the law generally provides that statements are not hearsay if they are offered to show the effect on the listener.[54]

Cirian's testimony regarding the requisite protocols when certain disclosures by the interviewed children are made was nothing more than her description of the steps she was required to take during the girls' interview process. Cirian testified only as to her actions as a result of the disclosures made to her during these interviews. We find that Cirian's testimony regarding the actions that were required to be taken and the protocols that were triggered in response to the girls' disclosures was not hearsay. As such, as a matter of law, Lee's trial counsel was not deficient for failing to object to Cirian's testimony as "derivative hearsay."

---

[53] See brief for appellant at 39.

[54] See, *State v. Poe*, 292 Neb. 60, 870 N.W.2d 779 (2015); *State v. McCave*, 282 Neb. 500, 805 N.W.2d 290 (2011).

Lee also argues that trial counsel was ineffective for failing to object to Cirian's allegedly improper opinion testimony when Cirian testified that the demeanor of R.W. and M.B. was consistent with the demeanor of a victim of sexual abuse. Lee argues that this testimony amounted to improper vouching for the credibility of the victims and was an improper opinion.

The record reflects that when the State initially questioned Cirian regarding the girls' demeanor and its consistency with children alleging sexual abuse, Lee's trial counsel objected to the testimony on the basis of relevance. Such an objection necessarily encompassed the propriety of Cirian's opinion.[55] Lee's trial counsel was not ineffective for failing to object to Cirian's conclusion, because the record demonstrates that such an objection was made. Moreover, we conclude that Cirian did not opine as to the reliability or the credibility of the girls' statements or allegations made during their respective interviews.

## VI. CONCLUSION

For the reasons set forth above, we affirm the decision of the district court.

AFFIRMED.

---

[55] See *State v. Merchant*, 285 Neb. 456, 827 N.W.2d 473 (2013). See, also, *In re Interest of Kyle O.*, 14 Neb. App. 61, 703 N.W.2d 909 (2005).

CASSEL, J., concurring.

I write separately only to remind the practicing bar that assignments of error on direct appeal regarding ineffective assistance of trial counsel must specifically allege deficient performance and that an appellate court will not scour the remainder of the brief in search of such specificity.[1] Our decision making this rule explicit was released on April 19, 2019.

---

[1] See *State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019).

In the appeal before us, Lee's sole assignment of error relating to ineffective assistance stated only, "Defendant's preservation of Post Conviction Relief issues." But for having been filed on December 21, 2018, it clearly would have failed the specificity requirement. Although we have declined to apply the specificity requirement retroactively,[2] that time is already gone for briefs being filed now. Counsel should understand that briefs filed after April 19, 2019, which fail to comply may have consequences beyond loss of such claims.[3]

---

[2] See *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019).

[3] See Neb. Ct. R. of Prof. Cond. § 3-501.1 (rev. 2017).